**STATE of Texas & City of Dallas, Appellants,**

v.

**John C. HEAL, et ux. Marie A. Heal, Appellees.**

**No. 05–93–00867–CV.**

Court of Appeals of Texas, Dallas.

Aug. 31, 1994.

Mark L. Bryza, Dallas, for appellants.

Charles A. Salazar, Douglas H. Conner, III, Dallas, for appellees.

Before THOMAS, BURNETT and CHAPMAN, JJ.

## OPINION

THOMAS, Justice.

We must decide whether homeowners who have part of their land taken by power of eminent domain for a highway construction project must be compensated for the diminution in value to the remainder caused by traffic increases. A jury awarded John and Marie Heal $50,000 in damages for the land taken and the diminution in value to their remaining residential property. The State of Texas and City of Dallas (collectively, the State) raise four points of error on appeal, asserting the trial court erred in allowing the jury to consider traffic projections for the year 2010, the closing of nearby city streets, and an appraisal report as bearing on the value of the Heals' remaining property. The State also urges the trial court erred in denying its amended motion for new trial. We affirm the trial court's judgment.

## FACTUAL BACKGROUND

### 1. The Controversy

The State filed a petition seeking to condemn 436 square feet of the Heals' 11,200–square–foot residential lot in connection with a major reconstruction project on North Central Expressway. The lot is improved with a single-family home. The Heals have lived at the location, 7933 Southwestern Boulevard, since 1983. Their property is on the south side of the street and is the third lot west of Central. The two lots between the Heals' property and Central's service road are also improved with single-family homes.

The date of the taking was March 27, 1989. The land taken is triangular in shape. The parcel is about seventy feet long: at its easternmost end, the depth is eleven and one-half feet; at its westernmost end, the depth is about one foot. The taking results in an irregular-shaped lot.

Special commissioners were appointed to hear the case. The commissioners awarded the Heals $10,900. The Heals objected to the award and appealed to the county court-at-law. The case was tried to a jury. The Heals produced expert testimony on the di-

minished value of the remaining property. The State also presented expert testimony. The jury determined that the value of the part taken was $6,853, and the diminution in value to the remainder was $43,147.

## 2. The Project

The Heals' property was taken in connection with what is referred to as the middle portion of the North Central reconstruction project. This portion of the project calls for doubling Central's traffic lanes from four to eight and increasing the southbound service road approaching Southwestern from three to four lanes. Additionally, Southwestern will be reconfigured. The 436 square feet of land acquired from the Heals will be used for a transitional widening of Southwestern as it approaches Central's southbound service road. The two-lane collector street will be expanded to five lanes, two westbound lanes and three eastbound lanes. The widening will allow the intersection to align with a new and larger bridge that will be installed on Southwestern.

The Heals' property is the last lot directly affected by the transition. The State does not plan to widen Southwestern west of the Heals' property. Thus, vehicles heading east in front of the Heals' property will find a widening of the roadway, while those traveling west from Central will see the road narrow. Consequently, the reconfigured road will form a "bottleneck" directly in front of the Heals' property.

Also in connection with the project, the State will erect a thirteen- to fourteen-foot-high wall to reduce the noise caused by increased traffic. The wall will begin south of Southwestern and provide a noise barrier for persons living on the interior streets between Southwestern and Lovers Lane. Persons living on Southwestern will not benefit from the wall. Because of the sound barrier, the State closed all interior streets feeding onto the southbound service road between Southwestern and Lovers Lane. Traffic from those interior streets will be rerouted onto Southwestern or Lovers Lane. The middle portion of the project is scheduled for completion in the year 2000.

## DAMAGES TO THE REMAINDER

### 1. Parties' Contentions

The State contends the trial court committed reversible error by allowing the jury to consider traffic projections for the year 2010 and the closing of the five interior roads as factors diminishing the value of the remaining property. The State argues that *State v. Schmidt*, 867 S.W.2d 769 (Tex.1993), *cert. denied*, ――― U.S. ―――, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994), and its progeny preclude the jury from considering such evidence in determining diminished market value.

The Heals counter that the amount of traffic passing a residential lot is relevant to a determination of its market value and, particularly, the diminution in market value to the remaining property once a taking has occurred. The Heals argue that the general principles set forth in *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 194 (1936), guide the disposition of this case.

### 2. Applicable Law

■ Article I, section 17 of the Texas Constitution provides in pertinent part: "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made...." When part of a person's property is taken, this provision requires adequate compensation both for the part taken and any severance damages to the remainder. *Schmidt*, 867 S.W.2d at 772 (citing *Buffalo B.; B. & Colo. R.R. v. Ferris*, 26 Tex. 588, 603 (1863) (applying identical language from Texas Constitution of 1861, article I, section 14)). Likewise, the Texas Property Code provides:

> If a portion of a tract or parcel of real property is condemned, the special commissioners shall determine the damage to the property owner after estimating the extent of the injury and benefit to the property owner, including the effect of the condemnation on the value of the property owner's remaining property.

TEX.PROP.CODE ANN. § 21.042(c) (Vernon 1984).

■ It is the damage to the remainder which is at issue in this case. The supreme

court set forth the measure for determining severance damages in its landmark *Carpenter* decision. Where a part of a tract of land has been taken for a public use, damages to the remainder tract are to be determined by ascertaining the difference between its market value immediately before and after the appropriation, taking into consideration the nature of the improvements and the use to which the land taken is to be put. *Carpenter,* 89 S.W.2d at 197.

■ The court defined market value in terms of a willing-seller/willing-buyer test: the price which the property would bring when it is offered for sale by one who desires, but is not obliged, to sell and is bought by one who is under no necessity of buying. *Carpenter,* 89 S.W.2d at 202. As to the matters of proof touching on value, the court stated:

> Generally it may be said that it is proper as touching the matter of the value and depreciation in value to admit evidence upon all such matters as suitability and adaptability, surroundings, conditions before and after, *and all circumstances which tend to increase or diminish the present market value.* Evidence should be excluded relating to remote, speculative, and conjectural uses, as well as injuries, which are not reflected in the present market value of the property.

*Carpenter,* 89 S.W.2d at 200 (emphasis added). Thus, evidence based on possibilities rather than reasonable probabilities is incompetent. *City of Pearland v. Alexander,* 483 S.W.2d 244, 247 (Tex.1972). Accordingly, the question of the competency of the evidence bearing on the issue of market value at the time of the taking rests on those factors of reasonable weight in the factual determination of what a willing seller would sell for and what a willing buyer would pay. *City of Pearland,* 483 S.W.2d at 247. The rule established in *Carpenter* is as well settled as any in our jurisprudence. *Schmidt,* 867 S.W.2d at 773.

We disagree with the State's argument that *Schmidt* and its progeny control the disposition of this case. *Schmidt* involved the taking of commercial property to convert a roadway into a controlled access highway in Austin. The court disallowed evidence of four specific factors: diversion of traffic, increased circuity of travel to the property, lessened visibility to passersby, and the inconvenience of construction activities. The court noted that it had in the past refused to allow recovery for loss of value due to diversion of traffic and circuity of travel. *Schmidt,* 867 S.W.2d at 777. The court saw no reason to treat the remaining two factors differently.

In this case, none of those factors was considered. In fact, the complaint here is not that a landowner will have some loss to his business based on the four factors cited above. Rather, the complaint concerns an increase in travel on a road fronting a residential lot. Thus, we do not believe that *Schmidt* is dispositive of the issues presented in this appeal. Accordingly, we will analyze this issue pursuant to long-standing rules regarding compensation for the diminution in value to the remaining property first set out in *Carpenter.*

### 3. Application of Law to Facts

■ The nature of the improvement is the widening of Southwestern as part of the Central expansion project. Although the State argues the tract taken will be *used* as a grassy parkway, we believe that characterization relies too heavily on the literal use without considering the purpose of the take. The land taken is needed to widen Southwestern to the service road to allow the intersection to be aligned with a new bridge. Therefore, in determining diminished value, we consider the impact this project has on the remainder. *See Schmidt,* 867 S.W.2d at 772; *Carpenter,* 89 S.W.2d at 197. All damages, present and prospective, that are the natural, necessary or reasonable incident of the improvement constitute the compensation which our constitution requires to be made. *See City of Pearland,* 483 S.W.2d at 246.

It is undisputed that the trial evidence established that traffic volume negatively affects the value of residential property. The question is whether, in this case, traffic volume in the year 2010 and increased traffic due to barricaded streets are factors a jury

can consider in determining fair market value after the taking.

■ **Traffic volume in 2010.** In the first point of error, the State advances two arguments: (i) the traffic counts were not relevant because there was no showing that the numbers measured traffic increases caused by the project, and (ii) the numbers were too remote, speculative, and conjectural because they look twenty-one years into the future from the date of the taking. The Heals counter that the numbers were the most current available to the State on traffic projections on Central, its service road, Southwestern, and Lovers Lane. Additionally, the Heals contend they were entitled to fully cross-examine the State's expert on the projections because the projections were used as a basis for her opinions and conclusions.

Terry Marlene Sams, coordinator for the middle portion of the Central reconstruction project, testified extensively about the State's expansion plans for the freeway and, particularly, Southwestern. Sams, a registered professional civil engineer, stated that the project's design was based on the 2010 traffic projections, which were contained in a 1987 cross-street operational analysis report. Sams acknowledged that the report was used to formulate the basis of opinions and conclusions concerning the project.

The study reflected traffic patterns in 1987 and in 2010, the year the entire project is slated for completion. Sams testified that prior to the taking, about 900 vehicles per hour passed the Heals' property. That number is forecasted to increase to 1500 vehicles per hour in 2010. Sams testified that these numbers were the most current available to the State because there were no projections closer to the date of the taking than those contained in the report.

We conclude the traffic projections were admissible for the jury's consideration as a factor bearing on the question of the fair market value of the property after the taking. The Heals did not introduce the traffic projections on the theory that these damages were recoverable as separate damage elements, but as justification for their opinion that the value of the remainder tract had been damaged and its market value reduced.

This project will route a significant increase in traffic onto Southwestern directly in front of the Heals' property. These were the traffic projections relied on by the State in redesigning Southwestern and creating a bottleneck in front of the Heals' driveway. There is nothing speculative or conjectural about the fact that the Heals' property will front a five-lane major thoroughfare at the turn of the century as opposed to a two-lane collector road before the taking. There is nothing speculative or conjectural about the fact that the road will carry sixty-percent more vehicles at that time.

The knowledge that the remaining property will be so burdened certainly bears on what a willing buyer would pay a willing seller in today's market. As the date approaches and the project becomes a reality, certainly the property's value will be even more affected. But it is the impact of that project, at its completion, on the property's fair market value after the taking that a jury can consider. We overrule the State's first point of error.

■ **Barricading of city streets.** In the second point of error, the State argues that its decision to close five interior streets between Southwestern and Lovers Lane was not admissible to show damages to the remaining property. Specifically, the State contends (i) the damages did not result from the taking but from the State's new use of its existing right-of-way, and (ii) alternatively, any injury was a non-compensable "community damage." The Heals contend the jury was entitled to assess the benefits and/or injuries created by constructing the sound wall.

Sams testified that, after being approached by a neighborhood group, the State agreed to construct a sound wall along the service road as a barrier to noise. The wall will be constructed fifty feet south of the intersection of Southwestern and the service road and will extend south to Lovers Lane. To erect that wall, however, the State must close the five interior streets and reroute the traffic. Although the wall will provide noise protection for the five interior streets, Sams acknowledged that persons living on Southwestern

will derive no benefit. The increased traffic will be forced into a "bottleneck," specifically created by this project, directly in front of the Heals' property.

We conclude the increased traffic due to the barricading of the streets was admissible as a factor for the jury to consider in assessing damages resulting from the taking. The taken property will be used to expand Southwestern. The State closed the roads to buffer noise due to increased traffic along the service road and Central. However, the State had to be able to reroute that traffic onto roads which could sustain the flow. Without the taking of the Heals' land, Southwestern would not have been an option.

Thus, we believe the damage results from the taking of the Heals' property. Any other conclusion would require the Heals to sustain a burden on their property, created by the State to relieve others of increased highway noise, without any benefit and without assessing that burden on the diminished value of the remaining property. The law requires just compensation for the damages occasioned to the remainder by reason of the taking and the construction of the improvement for which the land was appropriated. *See Carpenter*, 89 S.W.2d at 197.

We next consider the State's assertion that the injury is a "community damage." The property code precludes recovery for community damages. Section 21.042(d) provides:

In estimating injury or benefit under Subsection (c), the special commissioners shall consider an injury or benefit that is peculiar to the property owner and that relates to the property owner's ownership, use, or enjoyment of the particular parcel of real property, but they may not consider an injury or benefit that the property owner experiences in common with the general community.

TEX.PROP.CODE ANN. § 21.041(d) (Vernon 1984). The mere fact that injury is common to everyone on a street does not bar recovery. *Texarkana & N.W.R.R. v. Goldberg*, 68 Tex. 685, 5 S.W. 824 (1887) (homeowner had not suffered only community damages by construction of railroad tracks in street abutting his property such that there was room for only one car to pass at a time and sparks

from trains posed danger to his buildings). It is also not special injury simply because others farther away do not suffer at all. *Schmidt*, 867 S.W.2d at 781. As the court explained in *Schmidt*:

Whether an injury is community cannot be decided simply by setting the size of the relevant area. "Community" in this context means not only where, but, more importantly, what kind. It is the nature of the injury rather than its location that is critical in determining whether it is community.

*Schmidt*, 867 S.W.2d at 781.

We conclude the Heals' property does suffer a peculiar injury: their driveway will sit at the top of a bottleneck specifically created by this project. The increased traffic will be forced into this bottleneck. The Heals testified it will be more difficult to enter and exit the driveway because of that configuration. Although property owners to the east of the Heals will also suffer the impact of the increased traffic, the Heals will suffer an injury that is not common with the general community. We overrule the second point of error.

## ADMISSION OF NOTICE OF APPRAISED VALUE

■ In the third point of error, the State contends the trial court erred by admitting a notice of appraised value of the Heals' property prepared by the Dallas Central Appraisal District (the District). The State asserts the notice was hearsay. The Heals argue the document is a statement against interest, pursuant to rule 803(24) of the rules of civil evidence, and was thus admissible as an exception to the hearsay rules.

Defense exhibit number four is the District's notice to the Heals of the appraised value of their property: $140,040. The single-page exhibit has the name and address of the Dallas Central Appraisal District. It lists, presumably, five taxing entities and the taxable value of their residence, excluding the homestead exemption. One entity listed is the City of Dallas.

To be admissible under rule 803(24), the document must be a statement against the

pecuniary interests of the City of Dallas.[1] At trial, the Heals argued the District was an agent of the City of Dallas; thus, the notice was an admission by the City as to the property's value. On appeal, the Heals argue the appraisal notice was offered for the limited purpose of showing a decrease in the value of their property, not to establish a specific dollar amount after the taking. The Heals contend the notice is relevant and had no prejudicial effect on the State. We conclude that while the notice may be relevant, it is inadmissible hearsay.

The Dallas Central Appraisal District was created pursuant to section 6.01 of the property tax code. The district is a political subdivision of the State. TEX.TAX CODE ANN. § 6.01(c) (Vernon 1992). As such, it is separate and distinct from the City of Dallas. *Cf. Plano Indep. Sch. Dist. v. Oake*, 682 S.W.2d 359, 361 (Tex.App.—Dallas 1984) (holding that Collin County Central Appraisal District was not Collin County and was therefore required to file an appeal bond), *rev'd on other grounds*, 692 S.W.2d 454 (1985).

The property tax code expressly provides that the appraisal district is responsible for appraising properties for ad valorem taxes for the taxing units that impose such a tax on property in the district. TEX.TAX CODE ANN. § 6.01(b). Thus, the district appraises the property, and the City of Dallas then assesses a tax rate based on the total appraisal. The fact that the City of Dallas is statutorily compelled to accept the district's appraised value of the Heals' property does not make the appraisal the act of the City of Dallas.[2]

The Heals contend that *State v. Stiefer*, 443 S.W.2d 275 (Tex.Civ.App.—Tyler 1969, writ ref'd n.r.e.), is controlling. We disagree. *Stiefer* involved the question of the fair market value of Stiefer's remaining property. To show the property's value immediately before the taking, Stiefer offered a letter from the city tax assessor-collector assessing the property's reasonable cash market value. The letter stated that the tax assessor-collector had been instructed by the city to appraise the property. The court noted that there was no dispute that the city instituted the re-evaluation program which resulted in the setting of the value on the property. The court then concluded that fixing the market value of the property in question was an act of the governing body of the City of Tyler, not the city tax assessor-collector, and was thus admissible as a statement against interest. *See Stiefer*, 443 S.W.2d at 278. Our case is distinguishable from *Stiefer* because no affirmative act of the City was required to institute the District's appraisal. We therefore agree that the trial court erred in admitting this document as a statement against interest.

■ Having found trial court error, we must review the entire record to determine whether the State was harmed by its admission. In doing so, we look to see whether the admission of the document amounted to such a denial of the State's rights that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* TEX.R.APP.P. 81(b)(1).

There was an abundance of testimony regarding diminution in the fair market value of the remaining property immediately before and after the taking. Mrs. Heal testified she is a real estate broker and has sold residential properties in her neighborhood. She stated her property's fair market value immediately before the taking was $198,000. She estimated its value after the taking had been reduced by $75,000 to $80,000. In support of this opinion, Mrs. Heal said a real estate broker indicated, after the taking, that she would list the residence for sale at $125,000 to $135,000. Mrs. Heal also testified that

---

1. Rule 803(24) provides:
   **(24) Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true. TEX.R.CIV.EVID. 803(24).

2. A taxing unit is entitled to challenge before the appraisal review board the level of appraisals of any category of property, but not the appraised value of a single taxpayer's property. *See* TEX.TAX CODE ANN. § 41.03(1) (Vernon 1992).

the house next door, which was of similar age and construction, sold after the taking for $142,500.

The Heals' expert, real estate appraiser Leon Hurse, testified that the remaining property's market value before the taking was $223,896 and was $130,000 after the taking. He valued the part taken at $6,104. Hurse arrived at those figures by comparing the Heals' property with similar properties that had sold in the market, including the house next door to the Heals.

The State produced one expert on value. Real estate appraiser Marlin Blake testified the remaining property's fair market value before the taking was $192,600 and fell to $187,100 after the take, based on comparable sales. Blake valued the part taken at $5,400.

We conclude, based on this evidence, that the admission of the appraisal notice was harmless. *Cf. State v. Schaefer*, 530 S.W.2d 813, 815 (Tex.1975) (evidence harmful because it put before jury erroneous theory and it was only possible basis for award). Mrs. Heal and Blake both testified that the fair market value of the entire property prior to the taking was $198,000. Testimony also established that the house next door to the Heals, which was similar in age and construction, sold after the taking for $142,500. The difference between these two numbers nearly equals the amount of damages assessed by the jury. Thus, we cannot conclude that the jury's award was more likely than not based on the appraisal notice. In fact, it is just as likely that the award was based on the amount of the sale of the house next door. Because we cannot conclude that the admission of the evidence resulted in an improper judgment, we hold the error was harmless. Accordingly, we overrule the third point of error.[3]

## AMENDED MOTION FOR NEW TRIAL

In the fourth point of error, the State complains the trial court committed reversible error by refusing to grant its amended motion for new trial. The motion was based on the various complaints we have considered

regarding the admissibility of evidence of traffic increases. Our conclusion that that evidence was admissible necessarily disposes of this point of error.

We affirm the trial court's judgment.

CHAPMAN, J., dissents.

CHAPMAN, Justice, dissenting.

I respectfully dissent. The State was only required to compensate the Heals for the diminution in the value to the remainder that was the effect of *the condemnation*. The State was not required to compensate the Heals for the effects of its use of the land of others for the North Central reconstruction project. By permitting the jury to consider traffic projections for the year 2010 and the barricading of the roads, the trial court allowed the jury to consider factors in assessing severance damages that were not caused by the taking of the Heals' strip of land. This was error.

In *State v. Schmidt*, the State condemned a portion of two tracts of land. *Schmidt v. State*, 867 S.W.2d 769, 777–78 (Tex.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994). The land condemned was to be used in the reconfiguration of Highway 183. The property owners argued that evidence of diversion of traffic, increased circuity of travel, lessened visibility to passersby, and the inconvenience of construction activities were appropriate factors a jury could consider in determining the decreased value to the remainder. The Texas Supreme Court disagreed.

The majority distinguishes *Schmidt* by asserting that the factors the jury was permitted to consider in *Schmidt* were not the same factors in this case. The majority fails to distinguish *Schmidt's* holding that a landowner cannot recover for the State's use of property acquired from adjoining landowners. While the factors considered by the jury in this case are not the "*Schmidt* factors," I nevertheless believe *Schmidt* to be applicable and controlling.

In *Schmidt*, the Texas Supreme Court, adopting the rule enunciated by the United

---

**3.** The Heals did not argue on appeal that the statement was an admission against the State's

interest. In light of our disposition of this point of error, we decline to address the issue.

States Supreme Court in *Campbell v. United States*, 266 U.S. 368, 372, 45 S.Ct. 115, 116–17, 69 L.Ed. 328 (1924), stated:

> The rule supported by better reason and the weight of authority is that the just compensation assured by the Fifth Amendment to an owner, a part of whose land is taken for public use, *does not include the diminution in value of the remainder caused by the acquisition and use of adjoining lands of others for the same undertaking.*

*Schmidt*, 867 S.W.2d at 778 (citing *Campbell v. United States*, 266 U.S. at 372, 45 S.Ct. at 116–17 (emphasis added)).

The Supreme Court, applying the *Campbell* rule to the condemnation of land for highway purposes, held:

> Section 21.042(c) requires consideration of *"the effect of the condemnation* on the value of the property owner's remaining property." The effect of the State's condemnation on each tract in the present case—that is, the taking of a small strip of property—is different from the effect of the State's change in Highway 183. The statute allows recovery for only the former.

*Schmidt*, 867 S.W.2d at 777–78. (emphasis added).

The *Campbell* rule should apply unless:

> (1) the land taken from the condemnee landowner was indispensable to the ... project; (2) the land taken constituted a substantial (not inconsequential) part of the tract devoted to the project; and (3) the damages resulting to the land not taken from the use of the land taken were inseparable from those to the same land flowing from the condemnor government's use of its adjoining land in the project.

*Schmidt*, 867 S.W.2d at 778 (citing *United States v. 15.65 Acres of Land*, 689 F.2d 1329, 1332 (9th Circ.1982), *cert. denied*, 460 U.S. 1041, 103 S.Ct. 1435, 75 L.Ed.2d 793 (1983)).

Thus, three elements, indispensability, substantiality, and inseparability are necessary to negate the application of the *Campbell* rule. *United States v. 15.65 Acres of Land*, 689 F.2d at 1332.

## Traffic Volume in 2010

The Heals introduced evidence concerning traffic projections for Southwestern Boulevard in the year 2010. The issue is whether the increased projections were the effect of the taking of the Heals' strip of land. . The majority asserts that we look to the "purpose" of the take in order to determine what factors a jury is permitted to consider in determining the diminution in value to the remainder. The majority asserts that because the purpose of the take was to widen the bridge on the Southwestern overpass, the increased traffic density is the result of the take.

However, by merely looking to the purpose of the take to determine what factors a jury is permitted to consider nullifies the *Campbell* rule and ignores the Supreme Court's holding in *Schmidt*. If we merely look to the purpose of the take, a property owner could *always* recover for the diminution in value caused by the acquisition and use of adjoining lands of *others* for the same undertaking. The *Campbell* rule assumes the land taken from adjoining landowners was for the same undertaking. Therefore, the "purpose" of the take would always include damages flowing from the State's use of the land of adjoining landowners.[1]

The Constitution only requires compensation for all damages that are the natural, necessary, or reasonable incident of *the take.* In assessing these damages, the jury is to consider the uses to which *the land taken* is put. A landowner cannot recover for damages caused by the manner in which the project is to be constructed or operated on the land of others. The *take* in the Heals' case is the State's condemnation of a 436–square–foot strip of land. The Heals are not

---

1. To illustrate, if the majority's rationale was applied to the facts of *Schmidt*, the *Campbell* rule would not have prohibited the jury from considering evidence concerning damages resulting from the loss of traffic density. The "purpose" of the take in that case was to effect a change in Highway 183. Therefore, under the majority's reasoning, the jury could consider all damages that naturally flow from the change in Highway 183. The Supreme Court held to the contrary.

entitled to all damages that result from the expansion of Central and Southwestern, but rather only the damages that resulted from the taking of their strip of land. *See Schmidt,* 867 S.W.2d at 778.

There is nothing in the record to indicate that the increased traffic projections were the effect of the taking of the Heals' strip of land. While the record is not entirely clear, it appears that no part of the land taken will actually be used as a lane of traffic. The projections at best showed the project as a whole would increase traffic flow past the remainder. Permitting the jury to consider the increased traffic caused by the expansion of Central Expressway and Southwestern allowed the jury to consider damages caused by the State's use of adjoining lands acquired from other landowners and its new use of its existing right of way.

Furthermore, the exception to the *Campbell* rule does not apply in this case. The Heals have not shown the land taken was a substantial part of the reconfiguration of Southwestern, much less the North Central reconstruction project.

The jury was permitted to consider the effects of the State's change in Southwestern and North Central Expressway. I believe *Schmidt* dictates that the jury was permitted to consider only the effect of the State's taking of the Heal's small strip of property. Therefore, I disagree with the majority that the trial court did not err in admitting the traffic projections.

### Barricading of City Streets

Similarly, the trial court erred in permitting the jury to consider the barricading of the side streets between Southwestern and Lovers Lane in assessing the diminution in value to the remainder. The majority concludes that these damages were the effect of the taking of the Heals' strip of land because the State could not have re-routed the inner streets but for the expansion of Southwestern.

The appropriate question is whether the Heals' land was used to barricade the streets.

The rule in *Campbell* dictates that if it was not, no damages caused by the barricading are owed to the Heals.[2] No part of the Heals' property was used to barricade the inner streets. The damages flowing from the barricading of the streets are entirely the result of the State's use of the land of others or its use of its existing right of way. Therefore, permitting the jury to consider the barricading of the streets as a factor in assessing damages allowed the Heals to recover damages for the State's use of the land of others and/or their use of an existing right of way.

Finally, I believe the admission of evidence relating to factors not the effect of the take was harmful error. The jury awarded the Heals $43,147 in damages to the remainder. The evidence at trial concerning damages to the remainder centered around the effects of the project as a whole. The jury sent a note to the trial court explicitly asking the trial court whether it was to consider only the effects of the "take" or the effects of the project as a whole. The trial court did not answer the question. The evidence concerning the effects of the project as a whole was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* TEX.R.APP.P. 81(b)(1).

Because I believe the trial court erred in admitting testimony concerning the assessment of damages that were not the result of the condemnation, I would reverse the trial court's judgment and remand the case for further proceedings. Accordingly, I dissent.

---

**2.** Of course, if the barricading of the streets was considered a "taking" in and of itself, the jury would be permitted to consider the damages caused by the barricading.